No. 74,579

STATE OF KANSAS, *Appellee*, v. JOHNNIE C. SHEARS, *Appellant*.

(925 P.2d 1136)

Opinion filed October 25, 1996.

*Hazel Haupt*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*James A. Brown*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Before sentencing, defendant Johnnie C. Shears moved to withdraw his no contest pleas to first-degree premeditated murder, rape, and aggravated robbery. After new counsel was appointed to represent Shears, the district court heard and denied the motion.

The primary issue is whether the district court abused its discretion in denying Shears' motion. Additional issues are whether: (a) Shears' no contest plea to premeditated first-degree murder should be set aside because the factual basis provided failed to establish the elements of that offense; and (b) the district court erred (1) when it used Shears' pleaded-to convictions to enhance his criminal history score and (2) in accepting Shears' prior adjudications as a juvenile offender to calculate his criminal history score.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (Shears was convicted of an off-grid crime). We find no error and affirm.

## FACTS

Shears was charged with premeditated first-degree murder, K.S.A. 21-3401, an alternative count of felony murder, and attempted aggravated robbery, all arising from Shears' killing of David Cook on December 7, 1994 (the murder case). After the pre-

liminary hearing, the State served notice of its intent to seek a hard 40 sentence.

Shears was also charged with: (1) rape, K.S.A. 21-3502, and aggravated battery, K.S.A. 21-3414, arising from an incident on September 27, 1994, at a Motel 6 (the rape case), and (2) aggravated robbery, K.S.A. 21-3427, because of a robbery of Little Caesar's on December 5, 1994 (the robbery case).

Retained counsel Thomas Lietz entered appearances on behalf of Shears in all three cases. At the time of the offenses, Shears was 17 years of age and on probation for three prior juvenile adjudications.

In a January 31, 1995, letter to Lietz, David Debenham, Assistant District Attorney, memorialized the State's plea agreement proposal for the murder and rape cases. Shears would enter a plea of guilty to: (1) premeditated first-degree murder (the State would dismiss the attempted aggravated robbery charge and agree not to seek the hard 40 sentence), and (2) rape (the State would dismiss the aggravated battery charge). In a February 6, 1995, letter, Debenham offered that if Shears would plead in the robbery case, the State would not oppose a sentence concurrent to any sentence imposed in the murder and rape cases.

Shortly after receiving the letters, Lietz reviewed them with Shears, discussing the terms of the proposed plea bargain. However, Shears claims not to have read the letters.

The State followed through with its agreed concessions and further agreed not to seek an upward departure in the robbery case.

Before the plea hearing, District Judge James P. Buchele informed Lietz that he (Judge Buchele) had received a letter from Shears expressing dissatisfaction with Lietz. Lietz talked with Shears, Shears' mother, and Shears' grandparents. Lietz thought they had worked everything out.

The facts of the murder case were provided to District Judge Fred Jackson by the State during the plea hearing. Because Shears limits his claim of an inadequate factual basis to the premeditation elements in the murder case, we need not set out the facts of the rape and robbery cases.

At the beginning of the hearing, the State informed the judge of the terms of the plea agreement and made it clear that there was no agreement concerning departure in the rape case. Lietz agreed that the terms were correctly stated. The judge then asked Shears if he had had enough time to discuss the case with his attorney. Shears said that he did not understand what was said, because he understood there would be no departure. After the judge gave Shears some time to discuss the matter with his attorney, the State agreed not to seek an upward departure. The judge asked if Shears understood what was going on and if the State's statements concerning the plea negotiations agreed with Shears' understanding, and Shears said, "Yes."

The judge asked Shears if he understood the charges in the three cases and repeated those charges to Shears. The following discussion took place:

SHEARS:    "I thought the first charge was felony murder."
COURT:     "Well, it's charged felony murder in the alternative."
           (Conference with counsel).
COURT:     "Do you understand the charges?"
SHEARS:    "I thought it was felony murder."
           (Conference with counsel).
"MR. LIETZ:  Thanks, Judge."
COURT:     "(By the Court) Do you understand the charges, Mr. Shears?"
SHEARS:    "Yeah."

Shears waived formal reading of the charges.

The judge asked Shears if he understood the possible penalties for the charges, and Shears responded, "Not all of them." Shears was given additional time. The judge asked Lietz if he had explained the possible penalties and Shears' rights to Shears. Lietz stated they had gone through it three more times. The judge asked Lietz to state for the record his advice to Shears concerning the penalties. Lietz said: "Judge, we were looking at the murder charge as being off the grid. We were looking at the rape charge as being a Level 2, Category B. We were looking at the agg. robbery as severity Level 3 and then again B for criminal history."

The State added:

"Judge, just for the record, the murder case carried a life imprisonment sentence with parole eligibility in 25 years. The rape case is as Mr. Lietz stated, Level 2, criminal history, I believe it appears to be B at this point and time, which would place him within 260 months at the low end, 275 at the middle—excuse me, 274 at the middle, 288 at the high end. However, that whole range would be depending on his criminal record anywhere from 68 months to 308 months if it was category A.

"On the Level 3, which would be the agg. robbery, again we believe his criminal history would place him in B level, which would be a low of 172 and medium sentence of 180 months, the high of 190. But the whole range, depending on his actual criminal history, would be between 46 months and 206 months."

Shears responded "Yes" to the judge's inquiry whether he understood the range of possible penalties. In response to the judge's question, Shears also indicated he understood that his sentence would depend in large part on his criminal history and the results of a presentence investigation, and that his sentences in the cases could be ordered to be served consecutively or concurrently.

The State then orally presented the facts in the three cases. Before accepting Shears' pleas of no contest, the judge asked if there was any reason that Shears knew of why he should not enter a plea, and Shears responded, "No."

On February 10, 1995, Carol Williams, a court services officer, visited Shears as part of the presentence investigation. Shears had a copy of a newspaper article about his plea and a piece of paper with some numbers written on it which he showed to Williams. Shears asked Williams if the newspaper article indicating Shears was going to get 25 years was true, and Williams said that was "pretty realistic." Shears claimed that Lietz had told him something else. Williams described the paper as having two columns of numbers, one under "good" and the other under "bad." At the bottom of "good" was circled the number 9½, and at the bottom of "bad" was circled the number 70 or 72. According to Shears, Lietz wrote down the different crimes, felony murder, rape, and aggravated robbery on the paper and different numbers of months for those crimes. On one side of the paper, Lietz wrote how much time Shears would be looking at if he did not plead, and on the other side, the numbers if he did plead. According to Shears, Lietz told him that if he did not plead, he could be looking at 62 years or "a

hundred and something" years. Shears tried to explain to Williams that Lietz said that if he pleaded to the charges, he would end up doing 9½ years. The sheet of paper was later lost and is not in the record.

On or about February 23, 1995, Shears asked Othell Jones, his "guardian," to type up a statement in which Shears requested that his plea of nolo contendere be changed to not guilty on the basis of inadequate representation and that Shears did not fully understand the plea proceedings. Shears signed it, had it notarized at the jail, and sent it to the courthouse. The statement was file-stamped March 1, 1995. Shears also claimed to have sent to the courthouse, before his plea hearing, an earlier letter typed by Othell Jones, in which Shears requested another attorney. However, the letter is not in the record. About February 27, 1995, Lietz received a handwritten letter signed by Shears expressing dissatisfaction with his services. The letter claimed that Lietz had lied to Shears about doing only 9½ years if he pleaded and requested that Lietz have Shears' plea withdrawn. Shears' mother wrote the letter. Lietz then filed a motion to withdraw, which was granted.

Cindy Sewell, Assistant District Defender, was appointed to represent Shears. She filed a motion to set aside his no contest pleas. The motion advanced the following grounds:

"(1) There was confusion regarding the agreement not to seek departures;
"(2) Defendant stated he didn't understand what was being said;
"(3) During the plea there were repeated conferences between defendant and Mr. Lietz;
"(4) Defendant thought he was pleading to felony murder;
"(5) Defendant did not understand the penalties for the crimes;
"(6) The Court ordered Mr. Lietz to explain to defendant his rights and what was going on;
"(7) Upon being asked by the Court as to maximum penalties that defendant was advised, Mr. Lietz merely gave severity level;
"(8) Defendant was induced to enter said plea by his attorney's misstatements of the law. He did not understand the consequences of his plea."

At the hearing on the motion before Judge Buchele, Sewell called Lietz, Shears, and Williams as witnesses. Besides direct examination and the State's cross-examination, Judge Buchele questioned

Lietz at length about his representation of Shears. Judge Buchele denied the motion, and Shears later appeared for sentencing.

The State requested that Shears be sentenced using criminal history classification A, treating the three crimes as separate cases and using them as prior crimes in the criminal history determination. The State also requested that the sentences for first-degree premeditated murder and rape be imposed consecutively. Ms. Sewell objected to the criminal history classification as "A," opposing the use of any of the crimes in the three cases in the criminal history determination, although she agreed that Shears' criminal history included two prior person felonies (the juvenile adjudications). Ms. Sewell requested that Shears be sentenced using criminal history category B.

Ms. Sewell asked that the motion to withdraw the plea be reconsidered and also placed the following objections to sentencing on the record: (1) ineffective assistance of counsel due to misrepresentation and wrong advice from Shears' attorney before and at the time of the plea; (2) the complaint and affidavit in the murder case show that Shears stated the shooting was an accident; and (3) the rape case was dismissed after it was first filed, but was refiled after the murder occurred, and the rape victim stated she was intoxicated at the time and did not know who shot her.

Judge Buchele denied the motion to reconsider. He found that Shears' criminal history classification should be "category A."

The appeals of all three cases have been consolidated.

## DISCUSSION

### Withdrawal of the No Contest Plea

K.S.A. 22-3210 sets forth the procedures for acceptance and withdrawal of guilty or nolo contendere pleas. The appropriate standard of review is whether the district court abused its discretion in refusing to allow withdrawal of the plea. Shears bears the burden of showing such abuse. *State v. Johnson*, 258 Kan. 607, 610-11, 907 P.2d 140 (1995).

Shears contends his plea was involuntary because of Lietz's misleading or incorrect advice. He recognizes that "abuse of discre-

tion" is the standard of review, but argues that the district court's refusal to set aside his plea is a denial of constitutional magnitude.

"To set aside a guilty plea because ineffective assistance of counsel has rendered the plea involuntary, a defendant must show that counsel's performance fell below the standard of reasonableness and that there is a reasonable probability that but for counsel's errors the defendant would not have pleaded guilty and would have insisted on going to trial." *State v. Wallace*, 258 Kan. 639, Syl. ¶ 2, 908 P.2d 1267 (1995).

Shears must overcome a presumption that Lietz' assistance was reasonable. *Chamberlain v. State*, 236 Kan. 650, 654, 694 P.2d 468 (1985).

"Defense counsel has an obligation to advise a defendant as to the range of permissible penalties and to discuss the possible choices available to the defendant. [Citation omitted.] A mere inaccurate prediction by defense counsel, however, does not constitute ineffective assistance of counsel. [Citation omitted.]" *State v. Solomon*, 257 Kan. 212, 223, 891 P.2d 407 (1995).

Shears relies on *State v. Hill*, 247 Kan. 377, 385, 799 P.2d 997 (1990):

"In determining whether a defendant should be allowed to withdraw his plea, the trial court should consider whether the defendant was represented throughout by competent counsel; whether he was misled, coerced, mistreated, or unfairly taken advantage of; and whether his plea was freely, fairly, and understandingly made. [Citation omitted.]"

### Did Shears Receive Competent Representation?

Shears contends that Lietz gave him incorrect advice, which prejudiced him. If he had had correct advice, Shears says he would not have entered the pleas. Shears claims that Lietz told him the penalty for first-degree murder was "25 years to life," which was incorrect. The penalty is life imprisonment. K.S.A. 21-3401; K.S.A. 21-4706.

During the hearing on Shears' motion to withdraw his plea, Lietz repeatedly emphasized in his testimony that he told Shears the penalty for premeditated first-degree murder was a "flat" 25 years before any parole eligibility.

Shears argues that he understood "25 years to life" to mean that he would only have to serve half of that time, *i.e.*, 12½ years, and would also be entitled to a 20% good time credit, reducing his time

in prison to 9½ years. Lietz denied ever telling Shears that if he pleaded to the charges offered by the State, he would be eligible for parole in 9½ years. Lietz also denied telling Shears that Shears would be entitled to good time credit on the premeditated first-degree murder penalty. Most telling is Shears' own testimony on this subject. At the hearing on Shears' motion to withdraw his plea, the State asked Shears during cross-examination:

"Q.   Okay. You knew at the time of the plea based on what I said that the premeditated murder charge that you were going to plead to, on that charge, you would have had to do at least 25 years before you were even parole eligible, didn't you?
"A.   Yes."

Shears also contends that he thought he was pleading to felony murder, not premeditated first-degree murder, and received incorrect advice from Lietz regarding the distinction between premeditated first-degree murder and felony murder.

Lietz emphasized repeatedly in his testimony that he informed Shears that the State wanted a plea to premeditated first-degree murder, not felony murder, and that he explained the difference in the penalties.

According to Shears, Lietz also misinformed him by telling him his criminal history was category "C." Lietz' testimony contradicts this. Lietz said that he knew that Shears was in the B level as far as criminal history at the time of the plea. The motion to withdraw the plea does not assert that Lietz incorrectly informed Shears of his criminal history. Neither the State nor Lietz ever mentioned criminal history category C at the time of the plea.

### Was Shears Misled, Coerced, Mistreated, or Unfairly Taken Advantage Of?

Other than the incorrect legal advice he claims he received from his counsel, which is contradicted by Lietz, Shears offers no evidence of being coerced, mistreated, or unfairly taken advantage of with regard to his plea. Although 17 years old at the time of the crimes, Shears was already a seasoned criminal with extensive exposure to the juvenile court system, having at least two prior adjudications for person felonies. Shears had only an eighth grade

education. However, he could read well. During the hearing on the motion to withdraw his plea, at the judge's request, Shears read aloud from the transcript of the plea hearing, in response to the State's questions. Shears asked questions during his plea hearing each time he did not understand something, and the judge gave him the opportunity to confer with his counsel to clear up the question. After Shears conferred with Lietz following each question, the judge inquired to make sure that Shears' question was answered properly. Shears claims that his confusion about whether an agreement on departures had been reached (when in fact none had been) supports his contention that he did not understand the sentencing agreements that had been reached with the prosecution. We do not agree. Shears demonstrated his bargaining skills during the plea hearing—not his lack of understanding—in obtaining an additional concession from the State not to pursue a departure.

Lietz testified that the State had never offered to let Shears plead to felony murder. Judge Jackson recessed the plea hearing in order for Lietz to explain to Shears the difference between premeditated first-degree murder and felony murder. After the hearing continued, Shears responded to the judge that he understood the charges and waived formal reading of them. Whatever question Shears may have had about the penalties was cleared up before Shears' plea was taken.

Shears has not overcome the presumption that Lietz' representation was reasonable.

### The Hearing Before Judge Buchele

Shears points out that at the hearing on his motion to withdraw his plea, Judge Buchele repeatedly referred to the murder charge as "murder one." While the more specific term "premeditated first degree murder" would have been preferred, the context in which the term "murder one" was used makes it clear that the judge was always using the term with reference to premeditated first-degree murder.

Judge Buchele's last two uses of the term "murder one" in his questions to Lietz make clear that he was referring to premeditated first-degree murder:

"THE COURT: All right. I guess all I'm trying to establish, at least as to the major case here, the controlling count, that what we're really talking about, the State's position was consistently, 'You must plead to murder one,' and that he knew that if he was convicted of murder one, that there was going to be a flat 25 years involved?

"MR. LIETZ: Yes.

"THE COURT: No matter. And the concurrent and consecutive and what he pled to in those other cases was all secondary and you could play in and out games and up and down games, the fact was it was a 25 year flat minimum sentence that was involved. Do you feel that that was understood between you and your client as to a murder one conviction?

"MR. LIETZ: Yes, I do."

After the exchange between Judge Buchele and Lietz, the State responded with the following questions for Lietz:

"Q. (BY MR. DEBENHAM) The State never offered to let your client plea to felony murder, did they?

"A. No. I asked several times and it was always a flat, 'No way.'

"Q. And the difference between those is felony murder is a life imprisonment with parole eligibility after 15 years, wasn't it?

"A. I think that's correct.

"Q. The State always demanded a premeditated murder felony, premeditated murder plea in this case, didn't they?

"A. That's correct."

Shears claims that Lietz "used coercive tactics" to persuade him to plead. According to Shears, Lietz told him that he should go along with the plea because he was upsetting the judge and if he did not enter the plea, he would spend the rest of his life in prison. Lietz denies the coercive tactics claim. After further cross-examination by the State, Shears said that while he and Lietz were standing in front of the judge at the time of the plea, Lietz simply told Shears to say "no contest."

Contrasted against Shears' claim of coercion is Judge Jackson's question to Shears immediately before accepting Shears' plea: "Is there any reason that you know of why you should not enter a plea?" Shears responded, "No."

### The Jail Visit

Shears focuses on the figure 9½ (written on the lost sheet of paper) in arguing that 9½ supports his contention that Lietz mis-

informed him as to the number of years Shears would face in prison on the murder charge. Judge Buchele had problems with the number 9½.

"THE COURT: I can't come up with nine and-a-half. I told you. That's why I was raising the question. Maybe they were playing with boxes or criminal history, too. You see, I can't come up with nine and-a-half. I can't think of any, with a rape conviction—"

Shears claims that the court's and counsel's references at the plea hearing to the charge as first-degree murder, without designating it as premeditated or felony, support his contention that he thought he was pleading to felony murder, not premeditated first-degree murder. The term premeditated first-degree murder was used by the State at the plea hearing. At the beginning of the hearing, the State described the plea negotiations, saying: "In [the murder case], the defendant would enter a plea to Count I, premeditated first degree murder, the State would dismiss the alternative count of felony murder in that count." Later in the proceeding, Judge Jackson asked Shears: "Do you understand the charges in [the murder case], the charge is murder in the first degree." Shears responded: "I thought the first charge was felony murder." Shears' response shows that he knew the judge was referring to premeditated first-degree murder, not felony murder. After the plea to the first-degree murder charge was taken, Judge Jackson stated: "The Court will accept your pleas of no contest, you are adjudged guilty on your pleas and the alternative count of felony murder and the Count 2 in [the murder case] are dismissed." "[M]istaken subjective impressions, in the absence of substantial objective proof showing that they were reasonably justified, do not provide sufficient grounds upon which to vacate a guilty plea." *State v. Snyder*, 10 Kan. App. 2d 450, 452, 701 P.2d 969 (1985) (quoting *People v. Smithey*, 120 Ill. App. 3d 26, 33, 458 N.E.2d 87 [1983]). We find no abuse of discretion in denying Shears' motion to withdraw his pleas.

## The Premeditation and Intentional Elements

K.S.A. 22-3210(a)(4) states: "Before or during trial a plea of guilty or nolo contendere may be accepted when . . . the court

is satisfied that there is a factual basis for the plea." The trial court must establish that all elements of the crime charged are present. *State v. Shaw*, 259 Kan. 3, 7, 910 P.2d 809 (1996). When a prosecutor presents the evidence to the court, and that evidence shows that all elements of the crime charged are present, a factual basis for a plea has been reached. *State v. Reed*, 248 Kan. 506, 512-13, 809 P.2d 553 (1991).

Shears waived the reading of the complaint at his plea hearing. Judge Jackson, who conducted the plea hearing, did not preside at the preliminary hearings in either the murder case or the rape case. The State gave a lengthy recitation of the facts in the murder case. Although the State informed Judge Jackson at the plea hearing that the preliminary hearing was relied on as part of the factual basis, there is nothing in the record to show that the judge saw or read the transcript of the preliminary hearing.

Premeditated first-degree murder is defined at K.S.A. 21-3401 as: "the killing of a human being committed: (a) Intentionally and with premeditation."

Shears acknowledges that the State's factual recitation included his admissions to: (1) planning the scheme to rob David Cook with the help of Shears' girlfriend, Torrie Mason, and (2) shooting David Cook in the back of the head after searching Cook's car, not finding any money, and ordering Cook to start walking. However, in Shears' admissions, he claimed to have shot Cook by accident as he attempted to pistol whip Cook with his 9mm handgun. Although admitting that the elements of a felony murder were satisfied, Shears claims there was not a sufficient factual basis for either the intentional or premeditation elements of the offense.

Premeditation can be established by circumstantial evidence. See *State v. Sanders*, 258 Kan. 409, 414, 904 P.2d 951 (1995) ("Premeditation and deliberation may be inferred from the established circumstances, provided the inference is a reasonable one."); *State v. Calderon*, 233 Kan. 87, 93, 661 P.2d 781 (1983) ("Intent, like any element of a crime, may be shown by circumstantial evidence.").

The State mentions several factors from which the intentional and premeditation elements can be inferred: (1) There was no

provocation; (2) Shears armed himself with a deadly weapon; (3) there was no evidence that Shears received any cuts, wounds, or abrasions; (4) the shooting occurred shortly after Shears arrived; and (5) the gun barrel was in direct contact with the back of the victim's head at the time it was fired.

"It is incumbent upon the judge to personally make a finding that a factual basis for the guilty plea in fact exists." *Snyder*, 10 Kan. App. 2d at 454.

While the State's recitation could have contained more evidence from the preliminary hearing, the factual recitation that the State gave to Judge Jackson at the plea hearing was sufficient to establish the "intentional" and "premeditation" elements of premeditated first-degree murder and the remaining elements that Shears concedes were presented. The State provided a brief summary of Dr. George Thomas' testimony from the preliminary hearing that "there were no abrasions, contusions or bruises to the back of Mr. Cook's head, that the gunshot wound was a contact wound, that it was in direct contact with the back of the head when the gun was fired." Although Shears claimed that the shooting was accidental in his statement to police, Dr. Thomas' testimony showed the shooting was no accident.

Shears points out that the State's recitation to Judge Jackson included a reference to an incident occurring on September 19, 1994, in which Shears fired shots at Torrie Mason's house while she and David Cook were inside. This fact is irrelevant. The State did not show that Shears knew David Cook was inside at the time or that Shears was shooting at Cook. However, the other evidence described by the State is sufficient to establish a factual basis for premeditated first-degree murder.

### Enhancing Shears' Criminal History Score

In determining Shears' sentences for the rape and aggravated robbery convictions Judge Buchele determined that Shears' criminal history category was "A." In making the criminal history determination, Judge Buchele applied the "inclusive rule" announced in *State v. Roderick*, 259 Kan. 107, 115, 911 P.2d 159 (1996) (al-

though *Roderick* had not yet been filed at the time of Shears' sentencing).

Shears argues that the statutory interpretation applied to his sentencing (the "inclusive rule") is unfair and violates his right to due process under the Fourteenth Amendment. Shears does not support this argument with any authority, nor does he discuss it any further in his brief, beyond simply mentioning it. An issue which is not briefed is deemed abandoned. *State v. Wacker*, 253 Kan. 664, 670, 861 P.2d 1272 (1993). Shears did not raise a constitutional objection with respect to criminal history at the time of sentencing or in a post-sentence motion to the district court. Ms. Sewell did object in the district court to sentencing on the grounds that Shears was denied his Sixth Amendment right to counsel and due process rights concerning his plea agreement. When constitutional grounds are asserted for the first time on appeal, they are not properly before us for review. *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993).

### Shears' Prior Adjudications as a Juvenile Offender

Shears asserts that the district court erred in accepting his prior adjudications as a juvenile offender to calculate his criminal history score.

Shears did not raise this issue in the district court. *State v. McDaniel*, 255 Kan. 756, 765, 877 P.2d 961 (1994) ("A point not raised in the trial court cannot be raised for the first time on appeal.").

Even if Shears had raised the juvenile offender argument below, the issue was recently addressed and disposed of contrary to Shears' assertion in *State v. LaMunyon*, 259 Kan. 54, 911 P.2d 151 (1996).

Affirmed.